IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Dr. Walter C. Howard, ) | C/A No.: 3:11-2214-MBS-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Allen University, Dr. Charles E. Young, ) | |
| and Dr. Pamela M. Wilson, ) | |
| ) | |
| Defendants. ) | |
| ) | |

In this employment discrimination case, Walter C. Howard ("Plaintiff") is suing his former employer Allen University ("Allen") and two Allen employees, Dr. Charles E. Young ("Young") and Dr. Pamela M. Wilson ("Wilson"), in their individual capacities ("Individual Defendants") (collectively "Defendants"). Plaintiff alleges a retaliation claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), against Allen and a claim of defamation under South Carolina law against Young and Wilson.[1]

This matter comes before the court on Defendants' motion for summary judgment filed on June 14, 2013. [Entry #77]. The motion having been fully briefed [Entries #82, #85, #88], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and

---

[1] Plaintiff also asserted a state law civil conspiracy claim; however, the court dismissed that claim on August 22, 2012. [Entry #48].

recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court deny Defendants' motion for summary judgment.

I.    Factual and Procedural Background

In 2005, Plaintiff began working for Allen as the vice president for student affairs. [Entry #82-5 at 3]. In his role as vice president for student affairs, Plaintiff supervised all of the academic division chairs, the director of admissions, and the registrar and reported directly to the president. [Entry #82-5 at 4]. He served in that position until 2008. [Entry #82-5 at 5]. In late 2008, Plaintiff was promoted to senior vice president and placed in charge of an on-line initiative to increase enrollment called the College for Professional Adults ("CPA"). [Entries #77-2 at 3–4; #82-6 at 27].

In his role over CPA, Plaintiff supervised three associate vice presidents: Dr. Sonya Melton ("Melton"), Dr. John Lane, and Dr. Tiffany Brown, as well as two administrative employees, Cynthia Neal and Penny Bennett. [Entry #77-2 at 81]. Melton had been demoted from the vice president of enrollment management to associate vice president. [Entry #82-5 at 10]. Plaintiff testified that shortly after Melton's reassignment, Young, then the president of Allen, directed Plaintiff to thoroughly document all of her actions. [Entry #82-5 at 23–25].

Plaintiff summarized his two-year supervision of Melton as follows:

We had a two-year working relationship. Year 1 was the school year 2008–2009. Year 2 was 2009–2010. In 2008–2009, when she was initially demoted and assigned to me she was angry and upset and frustrated and saw me as an arm of the administration who had demoted her, and in reality I had nothing to do with it . . . And she was resistant initially to working as

2

a team member, specifically in areas of criticism in Year 1. That was reflected in her evaluation.

In Year 2 it was just the opposite. She had adjusted. She did an outstanding job, and it was reflected in her performance evaluation.

[Entry #82-5 at 10–11].

Plaintiff gave Melton a negative performance evaluation in May 2009, noting that Melton led by domination and intimidation, demonstrated a gross lack of integrity, and failed to meet the minimum standard of performance expected of a professional at her level. [Entry #77-2 at 44–51].

Plaintiff claims he met with Young in late May or early June 2009 and recommended that Melton's employment be terminated. [Entry #77-2 at 9, 12]. According to Plaintiff, Young indicated to him at that time that he could not terminate Melton because she had filed litigation against him for sexual harassment, but that Plaintiff could change her position.[2]  *Id.*  Plaintiff claims that although he had heard rumors, this was the first time he had heard from Young about Melton's charge of sexual harassment. [Entry #77-2 at 10]. Plaintiff further claims that Young told him that he should be very proactive in his assessment of Melton's performance, such as monitoring her arrival time or any deviation from procedure so that Melton would "find it intolerable and would resign." [Entry #77-2 at 11–12]. Plaintiff states that he told Young that he would be less than a professional if he did anything other than what he did in 2008, i.e., writing down when she did not perform and talking with her in advance about it. [Entry

---

[2] Plaintiff's testimony differs from the statement he signed on September 16, 2009, in which he stated that the first he heard about Melton's claims against Young was from Allen's attorney in September 2009. [Entry #77-2 at 57].

3

#77-2 at 12]. According to Plaintiff, Young responded by threatening to make Plaintiff "invisible" and by stating: "In a college, Dr. Howard, it's just like a family. I'm the daddy. The daddy makes the rules and the rules are enforced with the children." [Entry #82-5 at 24]. Plaintiff testified that at every subsequent meeting thereafter, Young reiterated that he wanted Plaintiff to make Melton's life so untenable that she would quit her job. [Entry #82-5 at 25–26, 30]. Plaintiff further testified that he repeatedly told Young that he would only document her job performance and the deficiencies that he observed. [Entry #82-5 at 27, 30].

In June 2009, Plaintiff removed Melton's supervisory authority over Admissions and placed her in charge of identifying and recruiting academically-gifted students. [Entry #77-2 at 52]. In a written statement on September 16, 2009, Plaintiff claimed that Melton led by intimidation; that her supervisory and managerial style was autocratic, repressive, and dictatorial; that she verbally threatened her subordinates; that her leadership style fostered extreme stress among her staff; and that she exhibited unusual, if not irrational behavior. [Entry #77-2 at 54–57].

In April or May 2010, Plaintiff drafted a performance evaluation of Melton as follows:

> I said that based on her performance for this evaluation period that she's improved in all areas: Team orientation, the quantity and quality of her work products, her ability to accept criticism, and therefore I was giving her an above average evaluation.

[Entry #82-5 at 47–48]. According to Plaintiff, when he presented Young with a draft of the evaluation, Young insisted that Plaintiff rewrite it. [Entry #82-5 at 48]. Rather than

4

give Melton an untruthful evaluation, Plaintiff refused to complete an evaluation for Melton. [Entry #82-5 at 48–49].

Also in 2010, Plaintiff and his staff in CPA began working on a grant proposal to present to the South Carolina Department of Education ("DOE"). [Entry #77-2 at 156–57]. Plaintiff submitted the completed application to the DOE in April 2010, but he testified that the proposal was never submitted for review by the committee because of Allen's negative reputation in the community. [Entry #77-2 at 23–24]. On June 3, 2010, however, Plaintiff informed Young that he had 150 confirmed students for fall 2010, which he claimed would generate $225,750 in revenue. [Entry #77-2 at 65–66]. In October 2010, Plaintiff incorrectly represented to Lady June Hubbard-Cole ("Hubbard-Cole") that the DOE had awarded Allen approximately $250,000 for the program, but had withdrawn the funding when Allen "did not fulfill its obligations." [Entry #77-2 at 81].

Beginning in spring 2010, Young was asked by Allen's board to assess the administrative structure in light of the large number of vice presidents reporting to the president. [Entry #77-3 at 8]. As a result, Allen eliminated three vice president positions and merged them with other departments on campus. *Id.* During the restructuring, Plaintiff continued to hold the position of senior vice president over CPA, but lost direct supervisory responsibility and was informed that the CPA program was being moved to the academic affairs department. [Entry #77-3 at 9–10, 12; *see also* Entry #77-4 at 4]. Young testified that he planned to name Plaintiff as the executive director of a new initiative meant to build relationships with high school students and address high school

5

dropout rates; however, in early August 2010, Young was placed on administrative leave and ultimately terminated as president of Allen. [Entries #77-3 at 12–13; #82-8]. Wilson took over as interim president on August 3, 2010. [Entries #82-6 at 35; #82-7 at 24].

On August 19, 2010, Plaintiff completed an initial inquiry questionnaire with the South Carolina Human Affairs Commission ("SCHAC"). [Entry #77-2 at 87]. He stated that he had been harassed constantly and threatened with job loss for more than a year when he refused to support the harassment of Melton. [Entry #77-2 at 91, 93]. In support of his inquiry, Plaintiff asserted that his staff had been removed beginning in May 2010, that he was removed from the administrative leadership team in August 2010, and that an organizational chart presented by Young at a meeting on August 2, 2010, eliminated Plaintiff's position. [Entry #77-2 at 96].

On August 26, 2010, Plaintiff sent a letter, through counsel, to Stephen G. Morrison, Allen's counsel and a member of Allen's board of trustees. [Entry #82-3 at 5]. The letter detailed the alleged retaliation Plaintiff experienced after he opposed Young's retaliation against Melton. *Id.* The letter also referenced Plaintiff's intention to file a retaliation charge with SCHAC. [Entry #82-3 at 7].

Plaintiff, who had been on medical leave for a good part of the fall, returned to work in late October 2010. [Entry #82-6 at 36, 67]. At that time, Wilson assumed that Plaintiff would be working in academic affairs where CPA had been transferred and advised Plaintiff to speak with the new vice president of the department, Hubbard-Cole. [Entry #82-6 at 37, 67].

6

With regard to Plaintiff's position, Wilson testified that Plaintiff was required to work directly with Dr. Patrick Inyangetor, with whom he did not get along, and their duties and responsibilities inexplicably overlapped. [Entries #77-4 at 4–5; #82-6 at 29, 31]. She stated that Plaintiff had been put in an unfair role because his job and responsibilities were already being performed by academic affairs. [Entry #82-6 at 34–35].

Plaintiff, through counsel, sent further communication to Allen's attorney on October 28, 2010, stating that since Plaintiff returned from his leave of absence, Wilson had continued to engage in the retaliatory practices begun by Young by further demoting Plaintiff and "making him institutionally invisible." [Entry #77-2 at 82].

Following Plaintiff's counsel's letter of October 28, 2010, counsel for Allen arranged a meeting with Plaintiff at Allen's campus for December 1, 2010. [Entry #82-3 at 1]. Plaintiff and his counsel, as well as Allen's counsel and John Slavich, a human resources representative for Allen, attended the meeting. *Id.* The parties discussed matters related to Melton's lawsuit and Plaintiff's own claims of retaliation against Allen. [Entry #82-3 at 2]. Plaintiff advised Allen's counsel that he was in the process of filing a charge with SCHAC. *Id.*

On December 14, 2010, Plaintiff was presented a letter advising him that his employment was being terminated. [Entry #82-3 at 2, 13]. The letter offered to provide Plaintiff with one month of termination pay if he would release Allen and its directors and officers from any claims arising from his employment. [Entry #82-3 at 13–14]. On the date of his termination, Plaintiff was called to the human resources office where

7

Allen's in-house attorney, the human resources director, and three security guards were waiting for him. [Entry #82-5 at 71]. Plaintiff testified that he was presented with the letter from Wilson advising him of his termination, was escorted to his office to pick up his belongings, and was ultimately escorted to his car. *Id.* Wilson testified that security personnel escorted all of the terminated employees off the premises to ensure that the process was a safe one. [Entry #77-4 at 14–15].

Plaintiff filed a charge of discrimination with SCHAC on February 7, 2011, alleging he had been retaliated against for opposing unlawful employment practices against a female employee. [Entry #77-2 at 86].

II.  Discussion

   A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

8

B.  Analysis

1.  Retaliation Claim

Plaintiff asserts a Title VII retaliation claim against Allen. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U .S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998). The Supreme Court recently clarified that the standard for establishing the causation element of a prima face case of retaliation under Title VII requires "proof that the desire to retaliate was the 'but-for' cause of the challenged employment action." 133 S. Ct. at 2527–28; *see also id.* at 2534 (stating that "a plaintiff making a retaliation claim under [42 U.S.C.] § 2000e–3(a) must establish that his or her protected activity was a 'but-for' cause of the alleged adverse action by the employer").

Once Plaintiff establishes the elements of her prima facie case, the burden shifts to Allen to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. *See Burdine*, 450 U.S. at 253. At that point, Plaintiff has the

9

opportunity to prove that Allen's legitimate, non-retaliatory reason is pretextual. *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 271 (4th Cir. 2001).

### a.    Prima Facie Case

Plaintiff asserts that he engaged in protected activity when he: (1) refused to support Young's efforts to sexually harass and retaliate against Melton; (2) raised concerns and grievances about the treatment he and Melton received; and (3) took steps to file and ultimately filed a charge of retaliation against Allen. [Entry #47 at ¶ 28]. He further claims that Allen engaged in adverse employment activities when it (1) made him "administratively invisible" by removing his staff, budget, and responsibilities, and (2) terminated him. *Id.* at ¶ 29.

Allen does not dispute that it took an adverse employment action against Plaintiff; however, it challenges Plaintiff's allegations of protected activity and contends that Plaintiff cannot show a causal connection between the alleged adverse actions and the protected activity. [Entry #77-1 at 13–18].

### 1)    Protected Activity

With regard to Plaintiff's protected activity, Allen concedes that Plaintiff's letters to Allen's counsel on August 26, 2010, and October 23, 2010, were protected activity. [Entry #77-1 at 15]. Thus, this element of the prima facie case is established.

Allen argues, however, that Plaintiff did not engage in protected activity prior to August 26, 2010. [Entry #85 at 2]. In an attempt to discount Plaintiff's allegation that he engaged in protected activity by opposing Young's efforts to harass and retaliate against Melton, Allen makes much of Plaintiff's conflicting statements regarding when he first

10

learned of Melton's claims against Young. [Entry #77-1 at 14]. Allen argues that Plaintiff could not have engaged in protected activity by refusing to harass Melton unless he knew of her claims. *Id.* The undersigned finds that whether Plaintiff learned of Melton's claims in June 2009 or September 2009 is unimportant because Plaintiff alleges that he continued to oppose Young's directives well into 2010. For example, Plaintiff claims that he refused to modify Melton's 2010 evaluation despite Young's demand that he do so. Although Allen accurately asserts that Plaintiff's only evidence of Young's demands and directives is Plaintiff's own testimony, the undersigned notes that Allen likewise relies solely on Young's testimony to argue that the events did not occur as Plaintiff alleges. [Entry #85 at 2]. Consequently, whether Plaintiff engaged in protected activity prior to August 26, 2010, turns on whether Plaintiff or Young is telling the truth. Because the court is not permitted to make credibility determinations or weigh evidence when ruling on a motion for summary judgment, the undersigned recommends a finding that whether Young directed Plaintiff to make Melton's working life intolerable is a genuine dispute of material fact that precludes summary judgment. *See Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (holding that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when ruling on a motion for summary judgment) (internal quotations omitted).

Allen also disputes that Plaintiff's filing of a SCHAC charge is protected activity because it occurred after his termination. [Entry #77-1 at 15–16]. Although Allen admits that Plaintiff filed initial inquiry questionnaires with SCHAC in August 2010, it contends

11

that it did not have notice of Plaintiff's actions until this litigation. *Id.* at 16. In a letter to Allen's counsel on August 26, 2010, however, Plaintiff referenced his intention to file a retaliation charge with SCHAC. [Entry #82-3 at 7]. Thus, the undersigned finds that, prior to Plaintiff's termination, Allen was on notice of Plaintiff's intent to file a SCHAC charge.

2) Causal Connection

Allen argues that even assuming Plaintiff engaged in the protected activity identified above, he has not shown a causal connection between such protected activity and the alleged adverse actions. [Entry #77-1 at 16]. In so arguing, Allen concedes that the employees under Plaintiff's direct supervision were transferred in August 2010. *Id.* Allen contends that Plaintiff has failed to demonstrate a causal connection between his reassignment (and that of his staff) and his alleged conversation regarding Melton in June 2009 because the events are too far apart in time. *Id.* at 16–17. Allen's argument assumes that the June 2009 conversation is the only protected activity at issue. On the contrary, Plaintiff alleges that his opposition to Young's retaliation against Melton continued in frequent meetings from June 2009 through mid-2010, culminating with Young's demand that Plaintiff give Melton a negative evaluation. Although three to four months is ordinarily too long to establish temporal proximity, *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006), the record is not clear on when the decision to reassign Plaintiff and CPA to academic affairs occurred. Young's testimony regarding his intention to name Plaintiff as the executive director of a new initiative, coupled with the undisputed fact that Young was placed on administrative leave in early

12

August 2010, indicates that the decision to reassign Plaintiff was made before August 2010 and closer in time to the evaluation conversation. Consequently, the undersigned recommends a finding that the temporal proximity of the alleged evaluation conversation in April or May 2010 [Entry #82-5 at 47–48] and the August 2010 reassignment is sufficient to satisfy the third element of the prima facie case.

Even assuming Plaintiff has failed to establish causation related to his reassignment, the undersigned concludes that he has demonstrated causation through the temporal proximity of his letters to and meeting with Allen's counsel in August, October, and December 2010, and his termination on December 14, 2010. In particular, Plaintiff's meeting with Allen's counsel in which he asserts that he discussed his retaliation charge occurred less than two weeks prior to his termination, and the undersigned recommends a finding that this proximity is sufficient to raise an inference of causation. *See Taylor v. Republic Servs., Inc.*, 2013 WL 5178452 (E.D. Va. Sept. 16, 2013) (finding that a plaintiff can establish that a desire to retaliate was the "but-for" cause of his termination by showing "close temporal proximity" between the time the defendant learned of the protected activity and the time of discharge).

Based on the foregoing, the undersigned concludes that Plaintiff has set forth a prima facie case of retaliation.

                b.     Pretext

Allen asserts that Plaintiff's reassignment was the result of departmental restructuring and that his termination was the result of a reduction in force ("RIF") that eliminated 35 positions campus-wide. [Entry #77-1 at 19–20]. The undersigned finds

the reasons advanced by Allen for the adverse employment actions alleged by Plaintiff to be legitimate and non-discriminatory. The burden thus shifts to Plaintiff to establish that Allen's stated reasons were pretextual.

Plaintiff advances several arguments to demonstrate pretext, however, the undersigned finds most compelling his argument that his inclusion in the RIF was pretextual.[3] Plaintiff asserts that the timing of his termination is suspect in light of his meeting with Allen's counsel on December 1, 2010. [Entry #82 at 20–21]. Allen responds that the decision as to who would be terminated in the RIF had been made in the fall of 2010, prior to Plaintiff's meeting with counsel; thus, the timing of the meeting is of no consequence. It is unclear, however, when the RIF decisions were made and whether they were influenced by Plaintiff's protected activity (letters to counsel) in August and October 2010. Furthermore, the evidence regarding the events surrounding Plaintiff's reassignment and termination is primarily testimonial. The undersigned finds that the protected activity, adverse events, and non-discriminatory justifications from August 2010 to December 2010 are inextricably intertwined and that untangling them would require the court to weigh the testimonial evidence. As noted above, the court is not permitted to weigh evidence or make credibility determinations when ruling on a motion

---

[3] Plaintiff's argument that the restructuring was pretextual is based in large part on Wilson's testimony that she did not understand what Plaintiff's new role was and thought the position seemed almost "made up." [Entries #82 at 16; #82-6 at 30]. However, a detailed reading of Wilson's deposition demonstrates that she was not referring to the 2010 restructuring, but was referring to Plaintiff's 2008 reassignment to senior vice president in charge of CPA. [Entry #82-6 at 30]. Plaintiff also argues that the RIF itself was a pretext. [Entry #82 at 16–20]. Because the RIF resulted in the elimination of 35 positions campus-wide [Entry #77-1 at 19–20], the undersigned finds it unreasonable to conclude that the RIF was a pretext to terminate Plaintiff.

14

for summary judgment. In addition, as evidence of pretext, Plaintiff points to the termination ranking sheets listing Plaintiff and Melton as first and second, respectively, in the order of terminations. [Entries #82 at 23; #82-7 at 32–35]. In light of the retaliation claims encircling these employees at the time, the undersigned finds the ranking sheets to suggest that their terminations were not solely motivated by the RIF. The undersigned also finds compelling that in Plaintiff's termination letter, Allen offered to provide him with one additional month of wages if he would release all claims related to his employment. Consequently, the undersigned recommends finding that Plaintiff has advanced sufficient evidence to raise an inference of pretext and denying summary judgment on his retaliation claim.

### 2. Defamation Claim

Plaintiff asserts a defamation claim against the Individual Defendants. To recover for defamation under South Carolina law, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002).

As embodied by the fourth element, defamation in South Carolina "is classified as either actionable per se or not actionable per se." *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 309 (S.C. 2012). All forms of libel—written or printed defamation—are considered actionable per se, without a need to prove special damages. For slander—defamation that is spoken or communicated in any form other than libel—to be

15

actionable per se, the statements must charge the plaintiff with one of five types of acts or characteristics: "(1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession." *Goodwin v. Kennedy*, 552 S.E.2d 319, 322–23 (S.C. Ct. App. 2001).

Although Plaintiff initially asserted that Young defamed him by stating that he was "unfit to grow enrollment," Plaintiff concedes that the comment, made to a now-deceased Allen employee, is not sufficient to support a defamation claim. [Entry #82 at 28]. As a result, Plaintiff's defamation claim is based solely on the alleged conduct of Young and Wilson.[4]

Under South Carolina law, "a defamatory insinuation may be made by actions or conduct as well as by word." *Tyler v. Macks Stores of South Carolina, Inc.*, 272 S.E.2d 633, 634 (S.C. 1980). Defamation "need not be accomplished in a direct manner" and a "mere insinuation is as actionable as a positive assertion if it is false and malicious and the meaning is plain." *Id.* "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Cooper v. Lab. Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 381 (4th Cir. 1998) (quoting *Restatement (Second) of Torts § 563* in defamation case under South Carolina law).

Plaintiff argues that the Individual Defendants' actions constituted defamation per se because they suggested that Plaintiff was unfit for his business or profession. Plaintiff

---

[4] Plaintiff contends that, in combination with the Individual Defendants alleged defamatory conduct, Young's comment is further evidence of the defamation against Plaintiff. [Entry #82 at 28–29]. Because the alleged comment is unsupported hearsay made to a now-deceased third party, the undersigned finds that it does not provide support for Plaintiff's defamation claim.

16

claims Young defamed him by reassigning him to a position with no staff, budget, or administrative duties; removing him from the committee on the Southern Association of Colleges and School ("SACS Committee"); isolating him in a building with no other employees; and removing his name from the Allen organizational chart and website. [Entry #82 at 25]. Plaintiff asserts that in doing so, Young maliciously and falsely insinuated that Plaintiff was unfit to be a senior college administrator. *Id.* Plaintiff alleges that Wilson defamed him by refusing to communicate with him, terminating him, and having him escorted across campus by security officers. *Id.* at 26–27.

In this case, the court previously recognized that Plaintiff's positions as vice president for academic affairs and senior vice president carried significant responsibilities. [Entry #48 at 6]. In ruling on Defendants' motion to dismiss, the court held that third parties could have reasonably inferred that Plaintiff was stripped of his job duties, budget, and staff, and was ultimately terminated because he was unfit for his position. *Id.* at 6–7. The court further found that if these actions were taken in retaliation for Plaintiff's refusal to participate in Young's alleged vendetta against Melton, the insinuation was false. *Id.* at 7. Although the parties dispute whether some of the adverse actions alleged by Plaintiff actually occurred (i.e., loss of budget and removal from the SACS Committee), the parties do not dispute that Plaintiff was reassigned, lost his supervisory responsibilities, and was terminated. In light of the court's prior ruling in this case and the undersigned's recommended finding that a dispute of fact exists regarding whether Young directed Plaintiff to retaliate against Melton, the undersigned recommends that summary judgment on Plaintiff's defamation claim be denied. In so

17

recommending, the undersigned does not intend to suggest that all instances of reassignment or termination give rise to a claim for false insinuation defamation and makes this recommendation solely on the specific facts presented in this matter.  The undersigned specifically notes that a post-termination security escort on its own is insufficient to state a claim for false insinuation defamation.  *See Johnson v. Dillard's Inc.*, C/A No. 3:03-3445, 2007 WL 2792232, at *18 (D.S.C. Sept. 24, 2007) (adopting report and recommendation holding that where a terminated employee is walked off the premises, even by a uniformed officer, the conduct is not defamatory as a matter of law).

The Individual Defendants assert that even if Plaintiff were able to state a defamation claim based on their actions, those actions would be protected under a qualified privilege.  [Entry #77-1 at 25].  Under the affirmative defense of qualified privilege, "one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused."  *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 514 S.E.2d 126, 134 (S.C. 1999).  The court previously held that Plaintiff's allegation that the actions set forth above were motivated by his refusal to participate in Young's retaliatory actions against Melton is sufficient to raise the question of whether the Individual Defendants abused the qualified privilege.  [Entry #48 at 8].  The court further noted that whether the publication went too far beyond the occasion required, resulting in the loss of the qualified privilege, is a question for the jury.  *Id.*  Because a factual dispute remains as to whether Young directed Plaintiff to retaliate against Melton,

18

the undersigned is unable to determine as a matter of law whether the qualified privilege applies.

Plaintiff's claims in this case turn on the truth of his testimony regarding Young's alleged threats of retaliation, which Young disputes. This case, then, comes down to a battle of credibility, which the court is not permitted to assess. For this reason, the undersigned recommends a finding that genuine disputes of material fact exist and that summary judgment is unwarranted on either Plaintiff's Title VII retaliation claim or his defamation claim.

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendants' motion for summary judgment [Entry #77] be denied.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

September 23, 2013                              Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).